UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| **ROY G. CORDELL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) No. 2:14-00042 |
| | ) Judge Sharp |
| **OVERTON COUNTY, TENNESSEE;** | ) |
| **W.B. MELTON, Individually and in his** | ) |
| **Official Capacity as Sheriff of Overton** | ) |
| **County, Tennessee; JONATHAN** | ) |
| **RUSSELL STOUT, Individually and in** | ) |
| **his Official Capacity as an Employee** | ) |
| **of the Overton County Sheriff's** | ) |
| **Department; and JOHNNY R. CYRUS,** | ) |
| **Individually and in his Official Capacity** | ) |
| **as an Employee of the Overton County** | ) |
| **Sheriff's Department,** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM

This litigation arose after Plaintiff Roy G. Cordell was shot by an Overton County, Tennessee Sheriff's Deputy who was responding to a call about a man armed with a shotgun. Defendants, Overton County, Sheriff W.B. Melton, and Deputies Russell Stout and Johnny R. Cyrus have filed a Motion for Summary Judgment (Docket No. 32), to which Plaintiff has responded in opposition (Docket No. 44), and Defendants have replied (Docket No. 47). For the reasons that follow, Defendants' Motion will be granted and this case will be dismissed.

### I. Factual Background

On April 17, 2013, Plaintiff went to the Overton County Sheriff's Department to inquire about removing his former son-in-law, Joseph McNeiece, from a residence located at 411 Frogtown

1

Road in Overton. Plaintiff owned the residence and had rented it to his daughter and her then husband, but the daughter had vacated the home, and McNeiece was no longer making monthly rental payments.

Plaintiff was informed by Sheriff Melton that he would have to follow the eviction process and secure a court order. Sheriff Melton also went to speak to Mr. McNeiece and told him that he would be evicted in the next day or so.

On April 17, 2013, Plaintiff returned to the Sheriff's Department and was told by Defendant Stout that he would have to pay a filing fee in order to secure an eviction notice. Plaintiff did not have the money to pay the fee and became very angry about the situation.[1]

Plaintiff returned to his home at 564 Frogtown Road where he lived with his elderly mother, Lou Mullen. Also in the home was Helen Marie Clark, who worked as a caregiver for Ms. Mullen.

Plaintiff retrieved his shotgun and loaded it in the presence of Ms. Clark. According to Ms. Clark, Plaintiff was talking "mostly to hisself [sic]," but said, "I'm going to take care of it," which Ms. Clark understood to mean that "he was going to take care of his son-in-law because he wasn't paying the bill." (Docket No. 36-13, Clark Depo. at 10-11). Ms. Clark told Plaintiff, "Please don't do this. You don't need to do this." (Id. at 11).

Shotgun in hand, Plaintiff went to see Mr. McNeiece. At the same time, Ms. Clark called the 911 dispatcher because she was concerned.

Upon arriving at 441 Frogtown Road, Plaintiff got out of his car with the shotgun and walked

---

[1] According to Defendant Stout, Plaintiff said he did not "have the effing $142," he was "just going to get [his] gun and kill the son of bitches [sic]," and that he "then stormed out of the sheriff's department lobby." (Docket No. 36-11, Stout Depo. at 46-47). Plaintiff denies making any threats, but concedes he was "very upset," and "stormed away" saying "I'll get them out of the house." (Docket No. 36-12, Pf. Depo. at 41). Plaintiff also concedes that he used the "f word" in relation to getting McNeiece out of the house. (Id.).

2

up to the house. Plaintiff admits that he was carrying the weapon in order to threaten Mr. McNeiece.

Plaintiff was met at the door by his grandson, Joey, who told Plaintiff that his dad was asleep in the bedroom. Plaintiff entered the residence and walked towards the bedroom. However, something that his grandson said (which Plaintiff does not now recall) caused him to stop, leave the residence, and return home. Once Plaintiff left the McNeiece home, a 911 call was made from that residence to report the incident.

Upon arriving home, Plaintiff unloaded his shotgun and placed it in a closet. Shortly thereafter, however, he retrieved the gun and sat with it on his bed. The gun was in his lap and his hands were resting on it.

At some point between the time Plaintiff left his residence and returned, Deputy Stout received a call from dispatch, informing him that Plaintiff had left his home with a shotgun and was going to another residence on Frogtown Road. Deputy Stout was later advised by dispatch that Plaintiff had just left the McNeiece residence. Deputy Stout then went to the McNeiece residence and claims that he was told that Plaintiff had been there and threatened the occupants with a shotgun. According to Mr. McNeiece, he told Deputy Stout not to go to Plaintiff's home alone because "he's got a loaded shotgun." (Docket No. 36-14, McNeiece Depo. at 21).

As a result of the information obtained from the Mr. McNeiece, Deputy Stout called for backup. Deputy Johnny Cyrus responded.

The two Deputies then went to Plaintiff's home where they were met at the door by Ms. Mullen and Ms. Clark. Ms. Clark opened the door for the officers. When asked where Plaintiff was, both women pointed towards the hallway and indicated that he was in his bedroom.

3

Deputy Cyrus proceeded down the hallway, with Deputy Stout following. Both deputies claim Plaintiff said, "come in and get me" (or words to that effect). (Docket No. 37, Cyrus Decl. ¶ 6; Docket No. 38, Stout Decl. ¶ 6). Deputy Cyrus claims that he observed Plaintiff standing in the bedroom with the shotgun pointed at the floor, but could not tell if he had his hand on the trigger. Plaintiff claims that he was sitting on the bed with the shotgun across his lap. Regardless, Deputy Cyrus took a position of cover on the left side of the hallway and pointed his own shotgun at Plaintiff. Deputy Stout took cover on the right side of the hallway and also pointed his weapon at Plaintiff.

Plaintiff claims he asked the officers what they were doing in his home, and they told him that they were responding to a report of an assault. Both deputies immediately and repeatedly ordered Plaintiff to put the weapon down.

Ms. Clark testified in her deposition that the officers told Plaintiff to put the gun down on three occasions, and that, "I knew in my own mind, if [a Deputy] said it a third time, that something was going to happen[.]" (Docket No. 36-13, Clark Depo. at 21). In a post-incident statement, Ms. Mullen, also stated that the officers told her son to put the gun down. Even Plaintiff himself testified that the officers, "kept saying, put the shotgun down," although he claims that "the shotgun [wa]s laying in my lap [where it was] down. " (Docket No. 36-12, Pf. Depo. at 51).[2]

Ms. Clark claims that, after the Deputies entered the home, she "peeped in and around the corner" and could see Plaintiff pointing the shotgun down the hallway at the officers, which "scared" her. (Docket No. 36-13, Clark Depo. at 22) . The Deputies also insist that, when they told Plaintiff to put down the shotgun, Plaintiff lifted the gun and pointed the barrel at them.

---

[2] Later in his deposition, Plaintiff testified that he was told to drop the shotgun, "two or three times, four times." (Id. at 64).

4

Plaintiff admits that Deputy Stout attempted to grab the shotgun from him three to four times. He also admits that he kept "jerking" the gun away and claims that Deputy Stout's action in being "all over" him and in "trying to grab the shotgun . . . . was the cause of the gun coming across his face in the first place." (Docket No. 36-12, Pf. Depo. at 67). Plaintiff further admits that he refused to release the shotgun because it was his gun and he was "allowed to have a gun in [his] home." (Id.).

While Deputy Stout and Plaintiff were struggling over control of the gun, Deputy Cyrus yelled, "Shoot," (Docket No. 37, Cyrus Decl. ¶8), or, as Plaintiff remembers it, "Just shoot the SOB." (Docket No. 36-12, Pf. Depo. at 68). Deputy Stout fired one shot, which struck Plaintiff in the abdomen.

On April 17, 2013, an Overton Grand Jury returned a two count Indictment against Plaintiff. Both counts charged Plaintiff with aggravated assault in violation of Tenn. Code Ann. § 39-13-102. Specifically, Count 1 alleged that Plaintiff "knowingly cause[d] Jonathan Stout to reasonably fear imminent bodily injury while utilizing a deadly weapon, to wit: a shotgun[,]" (Docket No. 36-1 at 1), while Count 2 alleged that Plaintiff engaged in the same conduct toward Joey McNeicie. Plaintiff entered a "best interest plea" of guilt to reckless aggravated assault in relation to Count 1. He was placed on 3 years of supervised probation, and Count 2 was dismissed.

Based on the foregoing events, Plaintiff filed suit in this Court raising federal and state law claims. He brings federal claims pursuant to 42 U.S.C. § 1983 against Defendant Stout under the Fourth Amendment for the use of excessive force, under the Fifth Amendment for punishment without due process of law, and under the Fourteenth Amendment for the denial of equal protection of the law. He also brings a Section 1983 claim against Defendant Cyrus because he allegedly

encouraged the use of excessive force, and against Defendant Melton for allegedly failing to adequately train and supervise his staff, which showed deliberate indifference to Plaintiff's constitutional rights. Finally, Plaintiff brings a number of state law claims against Defendants, including assault and battery, negligence, the negligent infliction of emotional distress, and malicious prosecution.

## II. Standard of Review

As this Court has oft-repeated, the standards governing the review of motions for summary judgment are well-known. For present purposes, it suffices to simply note the following:

A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c); Covington v. Knox Cnty. Sch. Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. Analysis

**A. Federal Claims**

In response to Defendants' Motion for Summary Judgment, Plaintiff concedes that his Fifth and Fourteenth Amendment claims, his individual capacity claim against Defendant Melton, and his municipal liability claim should be dismissed. This leaves his individual liability claims against Defendant Stout for excessive force, and against Defendant Cyrus for the encouragement of

6

excessive force. Defendants seek summary judgment on both claims, either on the merits, or by virtue of qualified immunity.

Qualified immunity is an affirmative defense that shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Generally, the qualified immunity inquiry involves first determining whether a constitutional violation occurred, and, if so, a subsequent determination of whether the right infringed was clearly established. Saucier v. Katz, 533 U.S. 194, 202 (2001); McKinley v. City of Mansfield, 404 F.3d 418, 429-30 (6th Cir. 2005).[3]

Because Plaintiff claims that Defendant Stout used excessive force and that Defendant Cyrus encouraged such use, "the relevant question is whether the . . . use of force complied with that allowable under the Fourth Amendment." Simmonds v. Genesee Cnty., 682 F.3d 438, 444 (6th Cir. 2012). "Any claim of excessive force is evaluated under the objective standard of 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)).

In making the reasonableness determination, the Court looks at "1) the severity of the crime, 2) whether the suspect poses an immediate threat to the safety of the officer or others, and 3) whether he is actively resisting arrest or attempting to evade arrest by flight." Ciminillo v. Streicher,

---

[3]While this sequence "is often appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, 129 S. Ct. 808, 818 (2009). Instead, courts should use "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id.

434 F.3d 461, 467 (6th Cir. 2006). These factors are not exhaustive, however, because,

> the ultimate question is "whether the totality of the circumstances justifies a particular sort of seizure." St. John v. Hickey, 411 F.3d 762, 771 (6th Cir. 2005) (quoting Graham, 490 U.S. at 396). Furthermore, reasonableness must be judged from the perspective of a reasonable officer on the scene, not with the 20/20 vision of hindsight. See Terry v. Ohio, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." Burchett v. Kiefer, 310 F.3d 937, 944 (6th Cir. 2002).

Id.

With regard to the first and third factors generally used in making the reasonableness determination, Plaintiff points out that there was no warrant for his arrest, that he "was not in the commission of any crime, and that he was not attempting to evade arrest by flight." (Docket No. 44-1 at 6-7). As for the second factor, Plaintiff writes:

> . . . In the case at bar it is admitted that the Plaintiff possessed a gun. However, as Mr. Cordell testified, he was holding an unloaded gun, upside down, across his lap, and not pointing it at anyone. Further, Mr. Cordell's hands were not in a position to fire the weapon. In fact, Mr. Cordell's hands were crossed over the gun, making firing the weapon impossible. . . . Defendant Stout had rifle training and should have been aware of this anomaly. Instead, the two Defendants stormed into the home and because Mr. Cordell, who may not have comprehended everything the deputies were ordering him to do, did not follow the directions to perfection, Deputy Cyrus just yelled "just shoot the son of a bitch", which is exactly what Deputy Stout did. Mr. Cordell did not pose a risk to the officers, he was just the victim of overzealous and aggressive policing.

(Id. at 7).

While the Court is required to construe the facts in Plaintiff's favor for purposes of the pending motion for summary judgment, and while "the the federal rules squarely place th[e] burden on [him] to prove the existence of the disputed fact," Khamati v. Sec'y of Dep't of the Treasury, 557 F. App'x 434, 437-38 (6th Cir. 2014), this does not mean that the Court should simply rely on Plaintiff's cherry-picked facts in deciding whether judgment as a matter of law is appropriate.

8

Rather, "[t]he central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 569 (6th Cir. 2003) (quoting, Anderson, 477 U.S. at 251–52). This case is not so one-sided, as Plaintiff's own testimony shows.

Plaintiff's characterization of being shot while idly sitting on the bed with his hands crossed over the weapon is belied by his own deposition testimony. He admits that he was ordered to drop the weapon, that Deputy Stout tried to get the weapon away from him, that he repeatedly jerked on the weapon during this process, and that, the shotgun ended up being pointed at Defendant's Stout's face. It is hardly surprising that Defendant Stout chose to shoot because there was no way he could have known (as Plaintiff claims) that the weapon had been unloaded.

Further, construing the facts in favor of Plaintiff does not mean that the Court is allowed to ignore other, uncontroverted evidence, or consider the shooting in isolation and divorced from the constellation of events that led to the shooting. Instead, "[i]n determining whether excessive force was used, courts must ask whether the officer's actions, in light of the totality of the circumstances, were objectively reasonable." Kostrzewa v. City of Troy, 247 F.3d 633, 639 (6th Cir. 2001).

It is undisputed that (1) after Deputy Stout spoke with Plaintiff about evicting Mr. McNeiece, Plaintiff stormed out of the police station saying that he would get Mr. McNeiece out of the house; (2) Plaintiff went home, retrieved his shotgun, loaded it, and told Ms. Clark that he was going to the McNeiece home, which prompted Ms. Clark to call the 911 dispatcher; (3) Plaintiff walked inside the McNeiece's residence carrying a shotgun, which prompted yet another call to 911; and (4) Deputy Stout was informed of the calls to dispatch, went to the McNeiece's residence, and was told that Plaintiff had left and was carrying a loaded shotgun. It is further undisputed that (1) Deputies Stout and Cyrus were allowed into Plaintiff's residence by Ms. Clark; (2) both she and Ms. Mullen

directed them down a hallway towards a back bedroom; (3) Plaintiff was in the room holding a shotgun; (4) Ms. Clark testified she saw Plaintiff point the gun in the direction of the officers; (5) Plaintiff was repeatedly told to drop the weapon, but did not comply; (6) Deputy Stout tried to wrestle the gun out of Plaintiff's hand, which caused the barrel to be pointed at Deputy Stout's face and (7) Deputy Cyrus then told Deputy Stout to shoot, which he did.

The Fourth Amendment does not prohibit all force, including deadly force. Rather, an officer's use of deadly force is reasonable only if "the officer has probable cause to believe the suspect poses a significant threat of death or serious physical injury to the officer or others." Tennessee v. Garner, 471 U.S. 1, 3 (1985).

"Discerning reasonableness 'requires a careful balancing of . . . the individual's Fourth Amendment interests' against the countervailing governmental interests at stake.'" Solomon v. Auburn Hills Police Dep't, 389 F.3d 167, 173–74 (6th Cir. 2004) (quoting, Graham, 490 U.S. at 397). A court "must remember to consider the reasonableness of the officer at the scene, and keep in mind that officers must often make split-second judgments because they are involved in 'circumstances that are tense, uncertain, and rapidly evolving.'" Id.

Here, Defendant Stout's action was reasonable because, based upon a full and complete characterization of the undisputed evidence before the Court, any officer would believe that Plaintiff posed a significant threat of death to Deputy Stout and his partner. See Steele v. City of Cleveland, 375 F. App'x 536, 542 (6th Cir. 2010) (footnote omitted) (officers acted reasonably where, "[a]t the time the officers shot [plaintiff], he was physically wrestling one of those officers for control of the weapon, and was winning" and "[d]uring the struggle, the gun was pointed directly at another one of the officers"); Estate of Sowards v. City of Trenton, 125 F. App'x 31, 38 (6th Cir. 2005) (where undisputed evidence was "that when the apartment door was kicked in, [plaintiff] pointed a handgun

at [officers] through the doorway opening" summary judgment was appropriate and whether plaintiff "shot first or did not fire the gun at all is immaterial to whether the officers' actions were reasonable under the circumstances" because "[t]he issue is whether [plaintiff] threatened the officers with the gun at close range"); Margeson v. White Cnty., 579 F. App'x 466, 471 (6th Cir. 2014) ("the issue is not whether the Officers' use of deadly force was reasonable in the first instance – it is undisputed [plaintiff] pointed a rifle at them from his front door, and . . . any objectively reasonable law enforcement officer in that situation might fear for his own life and respond with deadly force").

This conclusion remains even if, as Plaintiff claims, he unloaded the shotgun prior to the arrival of the officers at his residence. See Withers v. City of Cleveland, 640 F. App'x 416, 425 (6th Cir. 2016) (emphasis in original) ("Although we know now that [plaintiff] was unarmed, the clarity of hindsight does not obscure the fact that, *under the circumstances existing at that time*, when [plaintiff] quickly raised his arm, a reasonable officer would perceive a threat and use deadly force for his own protection."); Eibel v. Melton, 904 F. Supp. 2d 785, 805 (M.D. Tenn. 2012) (citation omitted) ("Contrary to counsel's assertion at oral argument that an officer must not shoot if he is able to jump to the side and take 'a gut shot,' '[a] police officer need not wait for a suspect to open fire on him, much less wait for the suspect to actually hit him, before the officer may fire back.'"). For these reasons alone, Defendant Stout is entitled to summary judgment on the merits. See Hoover v. Walsh, 682 F.3d 481, 500 (6th Cir. 2012) (when court finds that constitutional rights are not violated, it is unnecessary to consider the second prong of the qualified immunity analysis); Sorrels v. McKee, 290 F.3d 965, 969 (9th Cir. 2002) (the "first prong of qualified immunity . . . mirrors the substantive summary judgment decision on the merits").

Even if it could somehow be said that Deputy Stout's action in shooting Plaintiff was objectively unreasonable, he is still entitled to qualified immunity. This is because when the defense

of qualified immunity is raised, the burden falls on Plaintiff to show not only that the officer's actions were unreasonable under the circumstance, but also that those action violated a clearly establish right.   Everson v. Leis, 556 F.3d 484, 494 (6th Cir. 2009); Barrett v. Steubenville City Sch., 388 F.3d 967, 970 (6th Cir. 2004)).

In response to Defendants' Motion for Summary Judgment, Plaintiff writes:

> The assertion of qualified immunity in this  misplaced [sic].  Without oversimplifying the matter, it is clearly unconstitutional to seize an individual with excessive force. Shooting a citizen is one of the greatest amounts of force that can be applied. While [Plaintiff] did have a gun, he did not point it at the defendants, and in fact was incapable of shooting the weapon. When the officer is not in danger, when the suspect is not attempting to evade or resist arrest, and when Mr. Cordell was not committing a crime, it is unconstitutional to use deadly force. Further, every officer is trained in the use of deadly force, including both Defendants, and understands that this is a clearly established right.

(Docket No. 44-1 at 11).  Though professing not to oversimplify things, Plaintiff does just that and, in doing so, has failed to carry his burden.

"The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right,'" Clemente v. Vaslo, 679 F.3d 482, 490 (6th Cir. 2012) (quoting, Anderson v. Creighton, 483 U.S. 635, 640 (1987)), and "the case law must 'dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*,'"  Gragg v. Kentucky Cabinet for Workforce Dev., 289 F.3d 958, 964 (6th Cir. 2002) (citation in original) (quoting, Saylor v. Bd. of Educ. of Harlan County, 118 F.3d 507, 515 (6th  Cir. 1997)). "Thus, in the  excessive force context, it is not enough that a plaintiff establishes that the defendant's use of force was excessive under the Fourth Amendment; to defeat

12

qualified immunity, the plaintiff must show that the defendant had notice that the manner in which the force was used had been previously proscribed." Baker v. City of Hamilton, 471 F.3d 601, 605 (6th Cir. 2006). In short, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194, 198 (2004)).

Here, Plaintiff points to no case law that would inform a reasonable officer that shooting an armed individual who refused to comply with orders to drop a shotgun, and who struggles to keep control of that shotgun, which ends up being pointed in the officer's face, violates a clearly established right. Plaintiff's failure to identify relevant authority is particularly telling when one considers that qualified immunity is intended to cover the "hazy border between excessive and acceptable behavior," Saucier, 533 U.S. at 206, and "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law,'" Hunter v. Bryant, 502 U.S. 224, 229 (1991) (citation omitted).[4]

Given the conclusion that Defendant Stout is entitled to summary judgment on Plaintiff's excessive force claim, it follows that Defendant Cyrus is entitled to judgment as well. Plaintiff's sole remaining claim against Deputy Cyrus is that he is responsible for Deputy Stout's conduct, but to prove such a claim Plaintiff would have to show that Defendant Cyrus "'(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.'" Murray-Ruhl v. Passinault, 246 F. App'x 338, 347 (6th Cir. 2007) (quoting, Turner v. Scott, 119 F.3d 425, 429 (6th Cir.1997)). There was no excessive force by Deputy Stout and, therefore, Deputy Cyrus cannot be held liable for participating in its use, supervising one who used such force, or protecting against such use.

---

[4] In making this observation, the Court is not suggesting that Deputy Stout was incompetent, or that he was operating in a hazy border area when he shot Plaintiff.

**B. State Law Claims**

As with his response to the Motion for Summary Judgment on the federal claim, Plaintiff concedes that several of his state law claims are no longer viable in light of the record that has been developed. In this regard, he concedes his negligence, negligent infliction of emotional distress, and malicious prosecution causes of action, leaving only his claim for assault and battery against Deputy Stout and the possibility that Defendant Overton County could be financial liable for that alleged assault and battery.

"Generally, 'if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.'" Harper v. Auto Alliance Int'l, Inc., 392 F.3d 195, 210 (6th Cir.2004) (citation omitted). That is, "the usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment." Brandenburg v. Hous. Auth. of Irvine, 253 F.3d 891, 900 (6th Cir. 2001).

"Dismissal is not mandatory, however, because supplemental jurisdiction 'is a doctrine of discretion, not of plaintiff's right.'" Harper, 392 F.3d at 210. In exercising its "broad discretion" to decide whether to continue to exercise pendant jurisdiction over state-law claims, a court can consider such factors as "'the values of judicial economy, convenience, fairness and comity[.]'" Gamel v. City of Cincinnati, 625 F.3d 949, 952 (6th Cir.2010) (citation omitted). Here, none of those concerns favor declining to exercise supplemental jurisdiction because discovery has been completed and it is clear that dismissal of the excessive force claim also requires dismissal of the assault and battery claim under Tennessee law.

"Where a plaintiff asserts a battery claim under Tennessee law that arises out of the same use of force as h[is] § 1983 excessive-force claim, the analysis is the same for both causes of action." Griffin v. Hardrick, 604 F.3d 949, 956 (6th Cir.2010). "That is, 'whether the analysis concerns

whether an officer violated a plaintiff's constitutional rights by using excessive force or whether the analysis concerns whether an officer committed state-law battery by using force that was 'clearly excessive,' the same principles . . . are applied.'" Id. (quoting, Lee v. Metro. Gov't of Nashville & Davidson County, 596 F. Supp.2d 1101, 1118 (M.D. Tenn. 2009). Moreover, a police officer is "'not liable for assault and battery in connection with a use of force he or she is statutorily authorized to employ,' and 'officers are privileged to commit a battery pursuant to a lawful arrest, subject to the excessive force limitation.'" Brown v. Christian Bros. Univ., 428 S.W.3d 38, 58 (Tenn. Ct. App. 2013) (quoting, 6A C.J.S. *Assault* § 5); see Partin v. Scott, 2008 WL 4922412, at *10 (Tenn. Ct. App. Nov. 13, 2008) (trial court's finding that none of the officers used excessive force barred plaintiffs' claims for assault and battery).

Summary judgment is therefore appropriate on Plaintiff's remaining state law claims.

### IV. Conclusion

On the basis of the foregoing, Defendants' Motion for Summary Judgment will be granted and this case will be dismissed with prejudice.

An appropriate Order will enter.

*Kevin H. Sharp*
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE